# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dana Newell,<br><br>    Plaintiff,<br><br>v.<br><br>Arizona Board of Regents, et al.,<br><br>    Defendants. | No. CV-18-01903-PHX-JAT<br><br>**ORDER** |

Pending before the Court is Defendants Arizona Board of Regents, Cynthia Lietz, and Jonathan Koppell's ("Defendants") Motion for Summary Judgment. (Doc. 60). Plaintiff Dana Newell ("Plaintiff") has responded, (Doc. 65), and Defendants have replied, (Doc. 69). The Court now rules on the motion.

**I.  BACKGROUND**

Plaintiff worked for Arizona State University ("ASU") from approximately September 25, 2000, to November 27, 2017. (Doc. 64 ¶ 1). By the time her employment ended, she had risen to become the Assistant Dean of the College of Public Service and Community Solutions. (*Id.* ¶ 3). At that time, she reported directly to Associate Dean Cynthia Lietz and, ultimately, to Dean Jonathan Koppell. (Docs. 60 at 2; 65 at 2).

While at ASU, Plaintiff held a leadership role in a program designed to encourage young professionals from sub-Saharan Africa ("the Fellows") to participate in public service ("the Program"). (Docs. 60 at 2; 65 at 3). In July of 2016, Plaintiff sent e-mails to other Program faculty members using profane language to complain about a colleague.

(Doc. 60 at 3; 65 at 3). After seeing these emails, Lietz wrote to Plaintiff expressing concern about her "tone/language" and the two later held a one-on-one meeting to discuss appropriate staff communications. (Docs. 60 at 3; 60-1 at 35). During that year's graduation ceremony, Plaintiff stepped out of the room while Koppell when acknowledged the contributions of the faculty member Plaintiff had previously complained about. (Doc. 60 at 4; 65 at 4). She later took to Facebook and posted:

> For the last six weeks of this amazing program, the amazing staff and I . . . have had a group text message to communicate with each other about how every moment of our program would work . . . . From meals, to transportation, to academic sessions, to reports, to [F]ellows getting sick or losing their keys or their phones or needing our help, most of the staff has responded to the messages and pitched in to make this experience happen. There are two male administers on this text. In six weeks of literally 20 plus group messages a day, they have not responded. Even when you were sick or needed help, they did not respond. In fact[,] I was worried they weren't getting the messages, so I asked. And one did respond that yea [sic] he gets the messages. These are the people I have been dealing with on this program. A program[] my family, staff and I built from scratch with my own connections for the last three years. So when you applaud them and thank them, just know not only did they not care about you enough to respond to a single message, they did the absolute minimum to make the program happen. But being unethical and drunk with you makes a leader? WTF. The fact is: these two men did everything they could to disrespect me and our staff. I am not the "help" we are not equal, I'm the Assistant Dean. And yea I'm a women [sic].

(Doc. 60-3 at 8–9). A former Fellow responded to this post. (*Id.* at 9; *see also* Doc. 60-1 at 18).

After hearing about this post, Plaintiff's supervisors decided to contact her to express their concerns about her behavior before she traveled to Washington D.C. to represent the Program on ASU's behalf. (Doc. 60-1 at 38). After Lietz called Plaintiff to discuss the issue, Koppel felt he needed further assurances from her that her behavior in

Washington D.C. would comport with ASU's expected standards and met with Plaintiff before her flight to ensure that she would remain professional on the trip. (*Id.* at 40, 69). Afterward, Koppell concluded it would be less disruptive for her to go on the trip than to cancel her participation. (*Id.* at 70).

Later, in December of 2016, Plaintiff requested and received intermittent leave under the Family and Medical Leave Act ("FMLA"). (Doc. 65 at 5). From then until her last day of leave on September 7, 2017, Plaintiff received approval on all her requests for FMLA leave. (Doc. 60 at 5 & n.3; 60-3 at 43–49). During this period, however, Plaintiff's relationship with her supervisors grew increasingly tense.

To begin with, on February 11, 2017, Lietz reached out to Plaintiff to schedule a performance review. (Doc. 60-4 at 11). The evaluation method used a five-point scoring system. (*Id.* at 16). A three indicated consistent performance at expected levels. (*Id.*). A four indicated frequent performance above expectations. (*Id.*). And a five indicated that the employee was innovative, proactive, and consistently performed above expectations. (*Id.*). That score was reserved for only the "best performers, those who have exceeded all their performance expectations for the prior year and made an exceptional or unique contribution during the performance year." (*Id.*). Before the meeting, Plaintiff awarded herself a five in each category on her self-evaluation form. (Doc. 60-1 at 26). When Lietz completed Plaintiff's evaluation in April, she awarded Plaintiff a four in four categories: "Service-oriented, Positive Attitude, Helpful"; "Collaborative, Team-oriented"; "Flexible, Adaptable"' and "Resourceful, Committed to Sustainability." (Doc. 60-4 at 18–19). She also gave Plaintiff a three in two categories: "Productive, Commitment to ASU" and "Respectful Communicator." (*Id.* at 19). Lietz rated Plaintiff at an overall score of four. (*Id.*). Although the evaluation did not specifically refer to the issues with the previous summer's Program, Lietz explained to Plaintiff that they caused her lower scores during their one-on-one meeting. (Doc. 65-5 at 31). Disagreeing with the evaluation, Plaintiff filed a statement of non-concurrence on April 28, 2017, claiming her FMLA leave played a part in her lower scores. (Doc. 60-4 at 22–23).

In June of 2017, Plaintiff escalated her concerns to Kevin Salcido—Vice President and Chief Human Resources Officer—demanding that ASU expunge the less-than-perfect rating, remove Lietz as her supervisor, and force Lietz to attend FMLA training. (Doc. 60-4 at 54). Salcido then advised Koppell to work with Plaintiff to resolve the situation. (Doc. 60-1 at 73). Koppell and Plaintiff held a meeting to work out their differences, but it bore no fruit. (*Id.* at 73). In July, Plaintiff sent an e-mail to Lietz and Koppell with 31 other ASU staff members blind close copied ("BCC"). (Doc. 60-5 at 8). The e-mail informed Lietz and Koppell (and everyone BCC'd) that she would be taking a sick day, would no longer share with them whatever illness she might have when doing so in the future, criticized their "horrible management," and accused them of violating the FMLA. (*Id.*). At around the same time, Plaintiff unilaterally cancelled all meetings with Lietz for the next four months. (*Id.* at 10–23).

Salcido personally met with Plaintiff in August. (Doc. 60-4 at 45). At the meeting, Plaintiff explained why she felt retaliated against for taking FMLA leave and spoke "in a very derogatory fashion about . . . Lietz." (*Id.* at 47–48). Salcido advised her that he felt the review was "very positive" and told her that "the best thing to do would be to lick your wounds, stop ruminating about it, put it in your rearview mirror and move on." (*Id.*). Soon after, Plaintiff forwarded Salcido e-mails between Lietz and herself where she asked Lietz to approve vacation that she had "submitted . . . months ago." (Doc. 60-5 at 29–30). When Salcido reminded her that she needed to continue to follow her supervisors' directions, Plaintiff responded: "Got it. Message heard loud and clear. Shut up and do as I'm told or find another job. Quite the retention approach for excellent employees." (*Id.* at 28).

Following the meeting with Salcido, Lietz, Koppell, and Salcido decided that "the next step has to be presenting [Plaintiff] with a memo stating expectations." (Doc. 60-5 at 32). That memorandum ("MOE") explained Plaintiff needed improvement in several areas in order to meet the requirements of her position. (*Id.* at 34–35). It first explained concerns about declining professionalism in Plaintiff's communications to others, highlighting her decision to use BCC to broadcast her criticism of Lietz and Koppell to 31 other staff

members and her recent e-mail to Salcido. (*Id.* at 34). It also noted her decision to unilaterally cancel all one-on-one meetings with Lietz for the next four months and explained that having regular meetings with supervisors is critical to her job duties. (*Id.*). The MOE further noted that she had requested vacation but did not provide for coverage while she was out. (*Id.*). Lastly, it explained that the expectation going forward was that she would work in her office during regular business hours and contribute to a positive workplace environment. (*Id.* at 35).

For a time, Defendants believed that Plaintiff was following through on these expectations. (Doc. 60-5 at 40). By November, however, Lietz and Koppell began discussing the "possibility of moving forward with termination." (Doc. 60-1 at 48). In their view, the most significant concern was Plaintiff's failure to provide certain reports breaking down enrollment numbers by degree. (Doc. 60 at 11). Despite Lietz asking for these reports in early September, Plaintiff had not completed them as late as a staff-meeting held on November 2. (Doc. 60-5 at 41). In both that meeting and an earlier one in October, Plaintiff attributed this delay to the IT department's failure to resolve a technical issue. (*Id.*). After looking into it, however, Lietz found that her only "e-form ticket" was submitted and resolved in September and she did not send any follow-up to IT until October 31, 2017—after she had already blamed IT for the delay. (*Id.* at 41–42). On November 27, 2017, Koppell fired Plaintiff. (Docs. 60 at 11; 65 at 11).

## II. DISCUSSION

### A. Summary Judgment Standard

The Court must grant summary judgment under Federal Rule of Civil Procedure ("Rule") 56 when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asserting "that a fact cannot be or is genuinely disputed must support th[at] assertion by" either "citing to particular parts of materials in the record" or "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B).

Thus, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must first identify portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the non-movant to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). "Only disputes over facts that might affect the outcome of the suit," and thus are material, "properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Such disputes are "genuine" when they can "reasonably be resolved in favor of either party." *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). The Court views all disputed facts in the light most favorable to the non-movant, *see id.*, but "[a] summary judgment motion cannot be defeated relying solely on conclusory allegations unsupported by factual data," *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B. Types of FMLA Claims.

"The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001). Employees have "two very different ways to protect these substantive rights," the entitlement or interference theory and the retaliation or discrimination theory. *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011).

The difference between these two claims turns on the employee's conduct. The FMLA's anti-interference provision, 29 U.S.C. § 2615(a)(1), prevents an employer from visiting negative consequences on an employee who has taken, or attempted to take,

FMLA-protected leave. *Bachelder*, 259 F.3d at 1124; *see also Sanders*, 657 F.3d at 778 (explaining that the "linchpin" of the entitlement theory is an employee's right to return after taking protected leave). On the other hand, the FMLA's anti-retaliation provision, 29 U.S.C. § 2615(a)(2), prevents an employer from discriminating in any manner against an employee who opposes practices that the FMLA makes unlawful. *Wallace v. Lockheed Martin Corp.*, No. CV-18-00463-PHX-DGC, 2019 WL 2100268, at *7 ("The key to an FMLA retaliation claim is that the employer punishes an employee 'for *opposing* unlawful practices by the employer.'" (quoting *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003))).

### C. Plaintiff's Interference Theory

Defendants argue summary judgment on Plaintiff's interference claim is appropriate for two related reasons. They assert that her performance evaluation and MOE were not adverse employment actions as a matter of law. (Doc. 60 at 13). Alternatively, they argue that Plaintiff "has produced absolutely no evidence that the 2016 performance evaluation, the MOE, or her termination had anything to do with her FMLA leave." (Doc. 60 at 14). Plaintiff responds that she has presented "sufficient evidence to suggest that Defendants entered into a course of conduct to penalize Plaintiff for her use of FMLA [leave] that became bolder and stronger as she continued to use her leave." (Doc. 65 at 13–14).

For an interference claim to survive summary judgment, an employee must show a triable issue of fact exists as to whether her employer impermissibly considered her FMLA leave in an adverse employment action against her. *Valtierra v. Medtronic Inc.*, 232 F. Supp. 3d 1117, 1127 (D. Ariz. 2017). The Ninth Circuit Court of Appeal's understanding of such actions is "expansive," including any action "reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1241, 1243 (9th Cir. 2000). Despite this expansive understanding, that court has made clear that merely trivial workplace inconveniences are not actionable. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000); *see also Foraker v. Apollo Grp., Inc.*, 427 F. Supp. 2d 936, 941–42 (D. Ariz. 2006) (citing examples of each).

An employee must also show a causal connection between that adverse action and her FMLA leave. *Foraker*, 427 F. Supp. 2d at 942; *see also Hambright v. Potter*, No. 05-1302-PHX-FJM, 2007 WL 1101262, at *7 (D. Ariz. Apr. 12, 2007). "Although an employer is liable for FMLA violations even when the employer did not know that its conduct violated the Act, the employer's intent is not irrelevant in FMLA interference claims." *Kelly v. Boeing Co.*, 400 F. Supp. 3d 1093, 1112 (D. Or. 2019). For example, "pretext may be circumstantial evidence that the FMLA leave was a negative factor in the employment decision." *Jones v. Nevada ex. rel. Bd. of Regents for Nev. Sys. of Higher Educ.* (*Jones II*), No. 2:14-cv-01930-APG-NJK, 2017 WL 10276018, at *2 (D. Nev. June 20, 2017) (citing *Xin Liu*, 347 F.3d at 1136–37). Temporal proximity can also sometimes support an inference of causation, but the nexus between the FMLA leave and the adverse action must be "very close." *Foraker*, 427 F. Supp. 2d at 942. Proximity, however, must be viewed with regard to its factual setting to determine if a jury could reasonably draw that inference. *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003). Thus, temporal proximity will rarely establish causation on its own. *Williams v. G & K Servs. Inc.*, No. CV-15-01744-PHX-DJH, 2018 WL 8262768, at *9 (D. Ariz. Mar. 30, 2018).

Here, Plaintiff claims she suffered several discreet adverse employment actions as part of a course of conduct meant "to penalize [her] for her use of FMLA [leave] that became bolder and stronger as she continued to take her leave" and culminated in her termination. (Doc. 65 at 13–14). Including the termination, the actions she complains of are the 2017 performance review, "bullying" by Koppell, and the MOE. (Doc. 65 at 14). Thus, to resolve Defendants' motion, the Court will first examine each discreet instance that Plaintiff relies on to determine if it would qualify as an adverse employment action and, if so, whether Plaintiff has shown it is causally linked to her FMLA leave. Then, the Court will engage in the same analysis for her argument that these actions evince a course of conduct showing Defendants used her FMLA leave in the ultimate termination decision.[1]

---

[1] Plaintiff also points to Defendants' supposed "negative attitude towards Plaintiff as demonstrated in recently disclosed emails that show they believed Plaintiff was a liar about her time off requests, noting specifically that [she] was using a great deal of leave and

i. 2017 Performance Review

An "undeserved *negative* performance review" can constitute an adverse employment action. *Brooks*, 229 F.3d at 928 (emphasis added). As alluded to above, the performance review at issue here followed a two-step process. Plaintiff first submitted a self-evaluation giving herself the highest score, five, in each category. (Docs. 60-1 at 26). Lietz then returned an evaluation with scores of three in two categories, four in four categories, and five in one category. (Doc. 60-4 at 18–19). Lietz awarded Plaintiff an overall score of four, indicating that

> [t]he employee performs above the expectations of their position on a frequent basis. They demonstrate a high level of performance on a consistent basis and their efforts at times may be innovative and proactive. On occasion, their contributions may have an impact on the organization.

(*Id.* at 16, 19). Plaintiff's argument that this performance evaluation amounts to an adverse employment action is foreclosed by the Ninth Circuit Court of Appeal's reasoning in *Foraker v. Apollo Group, Inc.*, where the court affirmed summary judgment against a plaintiff who did not "introduce[] any evidence suggesting that an overall rating of 'Meets Expectations' or a reduction in the overall rating from 'Consistently Exceeds Expectation' to 'Meets Expectations' would tend to chill an employee's exercise of FMLA rights." 302 F. App'x 591, 594 (9th Cir. 2008). Given that Plaintiff likewise failed to point to any evidence that her even more favorable performance review would tend to chill the exercise of FMLA rights, the Court must conclude that she too fails to show it was an adverse action.

In an attempt to salvage the relevance of the performance evaluation, Plaintiff (in a footnote) seizes on *Xin Liu*'s admonition that courts should carefully analyze termination decisions relying on subjective evaluations for impermissible motivations because they "are particularly 'susceptible of abuse and more likely to mask pretext.'" 347 F.3d at 1136 (citation omitted). (Doc. 65 at 14 n.8). Initially, the Court notes no evidence shows the

---

specifically FMLA leave" and "minimized an injury she sustained." (Doc. 65 at 14). It is clear from Plaintiff's briefs that she cites this as evidence supporting causation for her cumulative conduct argument, and the Court will discuss it accordingly. *See infra* note 4.

termination decision depended on this performance evaluation which seemingly renders this statement inapplicable. More fundamentally, however, Plaintiff's argument seems to misunderstand what *Xin Liu* meant by "subjective." A performance evaluation is not subjective within the meaning of *Xin Liu* simply because it is based on a supervisor's assessment; rather, it is subjective when it relies on vague criteria that allows an employer to deduct scores without any factual basis. *Id.* at 1137 (citing criteria like "dedicated" and "enthusiasm" and "soft skills" as examples); *Fleming v. IASIS Healthcare Corp.*, 151 F. Supp. 3d 1043, 1055 (D. Ariz. 2015) (explaining that *Xin Liu* found evidence of causation from the combination of a "suspiciously steep drop in overall score" in vague categories and comments "suggest[ing] a negative attitude toward [the plaintiff] taking leave"). Thus, Plaintiff's issues with communication and professionalism during the Program—which were raised to her *before* she took FMLA leave and upon which her lower scores were based—provided a factual basis for the lower scores sufficient to dispel any inference of impermissible motivation. *See Clark v. AmTrust N. Am.*, No. 16-cv-05561-MEJ, 2018 WL 839148, at \*21 (N.D. Cal. Feb. 13, 2018) (reasoning that "ample evidence of Plaintiff's performance problems" does not implicate the concerns noted in *Xin Liu*).

Accordingly, Plaintiff has not created a genuine issue for trial regarding the 2017 performance evaluation.

    ii. <u>"Bullying"</u>

Plaintiff also claims that Koppell bullied her because she took FMLA leave. (Doc. 65 at 14). Construed generously,[2] Plaintiff could be taken to refer to three instances where

---

[2] And to support her argument at all, generously construed this statement must be. Plaintiff's argument cites nothing in the record to support her allegations of bullying. And when her factual background did cite to the record, it frequently employed lengthy string citations to support several different propositions across multiple sentences—a practice which is unsuited for summary judgment. On occasion, these citations directed the Court to pages of depositions that were actually attached to Defendants' motion but used the naming convention for the exhibits attached to Plaintiff's brief. For example, among three other exhibits, Plaintiff cites "Exhibit P. at 123:25-124:4, 126:2-128:16" in relation to her contention that Koppell raised his voice at her in a meeting. (Doc. 65 at 8). These excerpts, from Koppell's deposition, are not in Plaintiff's Exhibit P. Instead, those excerpts are contained in Defendants' Exhibit 4. (Doc. 60-1 at 73–74). All this is to say that Plaintiff's brief made it extremely difficult to track what evidence she claimed supported her arguments, which is quite surprising given that it was her burden to produce evidence sufficient to avoid summary judgment. Plaintiff's counsel should be reminded that

she claims Koppell raised his voice or "yelled" at her. (Doc. 65 at 8, 10–11). Plaintiff first states that Koppell raised his voice at her in a meeting held to address her letter of nonconcurrence with the 2017 performance evaluation. (*Id.* at 8). She cites no evidence to support her characterization of Koppell's behavior during this meeting. (Docs. 60-1 at 73–74; 60-4 at 22–23; 60-5 at 2; 65-5 at 11–13). The second and third episodes that Plaintiff could arguably be referring to are two meetings where she claims "Koppell yelled at [her] in front of other people" for not having completed the enrollment reports that he and Lietz asked her for. (Doc. 65 at 10). Plaintiff does not cite evidence—other than her own subjective impressions—to support her characterization of these meetings either. (Docs. 60-1 at 76–77; 65-2 at 29–30 (employee relations specialist reading Plaintiff's e-mail to HR); 65-4 at 14–36; 65-5 at 17–18).[3]

Based on only her personal view of what happened in these meetings, Plaintiff asks the Court to infer not only that Koppell behaved this way, but also that he did so, at least in part, because she took FMLA leave. In the employment-law context, however, "yelling," without more, is not an adverse employment action. *See Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) ("[H]arsh words are insufficient."); *Capristo v. Brennan*, No. C-15-1071 EMC, 2015 WL 4396268, at *4 (N.D. Cal. July 17, 2015) ("[Y]elling is akin to a snide remark; it does not rise to the level of a termination or a substantive change in work responsibilities."); *Rodrigues-Wong v. City & Cty. of Honolulu*, No. 08-00520 LEK, 2009 WL 3762982, at *5 (D. Haw. Nov. 9, 2009) (reasoning that acts like "yelling at . . . an employee are only petty slights and are not actionable"). Likewise, absent other evidence, neither are her personal impressions sufficient to show a triable issue of fact on causation. *Jones v. Nevada ex. rel. Bd. of Regents for Nev. Sys. of Higher Educ.* (*Jones I*), No. 2:14-cv-01930-APG-NJK, 2016 WL 4707987, at *3 (D. Nev. Sept. 7, 2016) ("Jones's subjective

---

"[j]udges are not like pigs, hunting for truffles buried in briefs," *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam), nor will they usually comb the record in an effort to cobble together evidentiary support for plaintiffs' arguments.

[3] Plaintiff's assertion that Koppell "admitted to yelling" in these meetings is untenable given that Koppell denied it during his deposition. (*Compare* Doc. 65 at 11, *with* Doc. 60-1 at 77 ("I did not yell.")).

- 11 -

1  belief is insufficient to survive summary judgment."); *see also Talbot v. New Seasons Mkt.,*
2  *LLC*, No. 03:12-cv-00141-HZ, 2012 WL 6738271, at *6 (D. Or. Dec. 27, 2012) ("At best,
3  plaintiff's testimony on these issues shows only that she subjectively believed that Rich
4  was unhappy with her periodic sick days. Her subjective belief is not supported by any
5  facts and cannot, by itself, demonstrate causation."); *cf. Little v. Cox's Supermarkets*, 71
6  F.3d 637, 643 (7th Cir. 1995) ("[W]hile an inference is enough to establish a prima facie
7  case, this nevertheless may not be created by mere subjective belief or debatable assertions.
8  *Proof* . . . is required.").

Accordingly, Plaintiff has not created a genuine issue for trial regarding Koppel's behavior toward her.

### iii. The MOE

Plaintiff next points to the MOE, asserting that the evidence shows it is essentially "a disciplinary warning given to employees with poor performance." (Doc. 65 at 14). To reiterate, the letter identified examples of Plaintiff's behavior in areas—like communicating with others and working with her supervisors—that Plaintiff needed to improve on to meet the requirements of her position. (Doc. 60-5 at 35). Plaintiff again cites no evidence to support her characterization of the MOE as disciplinary. To begin with, Koppell explicitly denied that the MOE had a disciplinary quality because it did not affect Plaintiff's status or pay and said only that "these are the expectations for your job and we would like you to meet them. Here is how." (Doc. 65-6 at 11). An employee relations specialist also denied that it was disciplinary; instead, she insisted that it was a form of coaching. (Doc. 65-2 at 27). Lastly, although Salcido at first said that it "would be reasonable" to consider the MOE to be disciplinary, he immediately corrected himself and indicated that it was "a notification that the organization was concerned about their performance." (Doc. 65-6 at 29). Far from showing that the MOE was an adverse employment action, what the evidence Plaintiff cites instead shows is that it merely restated expectations that were already in place and outlined a path to meet those expectations. Without more, it does not amount to an adverse employment action. *See Wehrli v. Tempe*

*Union High Sch. Dist.*, No. CV-12-1309-PHX-DKD, 2014 WL 1202954, at *4 (D. Ariz. Mar. 24, 2014) (explaining that performance plans are not adverse employment actions under cases from the 6th, 7th, 8th, and D.C. Circuits (collecting cases)); *E.E.O.C. v. Evergreen All. Golf Ltd., LP*, No. CV 11-0662-PHX-JAT, 2013 WL 4478870, at *10 (D. Ariz. Aug. 21, 2013) ("[M]erely placing someone on a performance improvement plan is not a per se adverse employment action."); *cf. Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 272, 274 (7th Cir. 1996) (holding that a purely lateral transfer, involving no reduction in pay, change in working conditions, or any "demotion in form or substance," is not an adverse employment action even if "disciplinary in nature").

Accordingly, Plaintiff has not created a genuine issue for trial regarding the MOE.

### iv. Cumulative Conduct Leading to Termination

As indicated above, Plaintiff pins most of her argument opposing Defendants' motion on the idea that the preceding actions depict an account where the more leave she took, the more negative consequences Defendants visited on her. Aside from these actions, Plaintiff points to no other direct or circumstantial evidence—like pretextual explanations—that Defendants used her FMLA leave as a negative factor against her. Thus, Plaintiff's argument asks this Court to infer from the coincident timing of the acts in this sequence that Defendants used her FMLA leave against her in her termination. To reiterate, such timing can be sufficient to send an FMLA-interference claim to a jury, but it must be viewed with regard to its factual setting.

Placed in context, Plaintiff's account cannot survive summary judgment. Defendants confronted Plaintiff regarding the professionalism of her communication (to both staff and the public) before she took her leave. As she took more leave, those same performance issues continued, and new ones sprang up. For example, Plaintiff unilaterally cancelled all of her one-on-one meetings with Lietz and, instead of explaining to her supervisors (or other appropriate personnel) why she felt retaliated against, she chose to decry her supervisors' "horrible management" in an e-mail sent to 31 other employees. Despite this, it is undisputed that Defendants continued to approve each and every one of

Plaintiff's FMLA requests. After she stopped taking leave, Plaintiff continued to miss work for various non-FMLA reasons, and her performance issues continued. Ultimately, she was let go in late November only after her repeated failure to complete reports for Koppell and Lietz that they had requested two months prior and her attempt to blame the IT department for that delay.

Thus, when Plaintiff's version of events is viewed in context, the timing of these acts is insufficient to create a genuine issue on causation here. *Kelley v. Amazon.com, Inc.*, 652 F. App'x 524, 527 (9th Cir. 2016) (reasoning that extensive and freely granted FMLA leave belied any reasonable inference that employee's leave was used against her in an adverse employment decision); *Law v. Kinross Gold U.S.A., Inc.*, 651 F. App'x 645, 648 (9th Cir. 2016) (explaining employee's reliance on temporal proximity between protected activity and termination, in addition his lack of prior discipline, created only a "metaphysical doubt" on causation, where the events leading to his discharge had been set in motion months before his leave); *Larmanger v. Kaiser Found. Health Plan of the Nw.*, 585 F. App'x 578, 578–79 (9th Cir. 2014) (affirming summary judgment where, inter alia, "the adverse actions were amply supported by legitimate concerns about Larmanger's work performance"); *Swan v. Bank of Am.*, 360 F. App'x 903, 906 (9th Cir. 2009) ("[A]n employer is not required to cease pursuing a disciplinary course of action against an employee that began before that employee took FMLA-related leave, simply because that employee took leave."); *Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1083 (D. Or. 2012) ("Given the fact that Denison received warnings, training and discipline prior to requesting FMLA leave, and that these problems continued unabated thereafter, coupled with her being given every FMLA leave she requested, no reasonable juror could conclude that the Corrective Actions resulted from her use of FMLA leave."); *Jones II*, 2017 WL 10276018, at *3 ("An employee cannot insulate [herself] from the consequences of [her] own performance failures by requesting and taking FMLA leave.").[4]

---

[4] As indicated previously, *supra* note 1, Plaintiff makes much of certain e-mails that she alleges were untimely disclosed and that she contends amount to evidence that "supports

Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for interference under the FMLA.

**D. Plaintiff's Retaliation Theory**

As with her FMLA interference claim, Defendants contend that Plaintiff has no evidence showing either causation or pretext on their part. (Doc. 60 at 15–16). Plaintiff, in response, asserts that Defendants' arguments wrongly apply the *McDonnell Douglas* burden-shifting framework to her claim and points to a cumulative "escalation of discriminatory behaviors by Defendants" as evidence of causation. (Doc. 65 at 16–17).

This Court has held that the *McDonnell Douglas* burden-shifting framework applies to FMLA retaliation claims. *Isom v. JDA Software Inc.*, No. CV-12-02649-PHX-JAT, 2015 WL 3953852, at *11 (D. Ariz. June 29, 2015). Thus, Plaintiff must first establish a prima facie case by showing "(1) she engaged in a protected activity by opposing her employer's unlawful practices, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." *Wallace*, 2019 WL 2100268, at *8. If Plaintiff succeeds in establishing her prima facie case, Defendants then have the burden to articulate legitimate reasons for the adverse employment action. *Isom*, 2015 WL 3953852, at *11. If they do, Plaintiff must then show those reasons were pretextual. *Id.* After *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338, 362 (2013), this Court has also concluded that claims involving "application of the *McDonnell Douglas* burden-shifting framework[,] as does a claim for retaliation under the FMLA[,] . . . the third element of the prima facie case . . . requires a showing of but-for causation." *Isom*, 2015 WL 3953852, at *11.

---

an inference of improper motivation." (Doc. 65 at 14–15). The evidence she cites does, broadly, contain e-mails between Koppell and Lietz casting doubt on the truth of her excuses for taking time off work and for not accomplishing her assignments in a timely manner. However, in only one instance did any of these comments relate directly to her FMLA leave—an e-mail from July 2017 where Koppell remarked "If you made a calendar and colored in hours consumed by FMLA, [s]ick, and vacation would there be anything left?" (Doc. 65-3 at 9). The Court cannot infer from this stray remark, made several months before Plaintiff's termination, that Defendants impermissibly used Plaintiff's FMLA leave against her in an employment decision. *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990) (explaining that stray remarks are not actionable particularly when they are unrelated to the decisional process).

In arguing that she has evidence sufficient to withstand summary judgment on her retaliation claim, Plaintiff cites evidence that she claims shows "an escalation of actions against Plaintiff by Defendants Lietz and Koppell" culminating in her ultimate termination. (Doc. 65 at 16). Plaintiff's "escalation" theory of causation is thus not meaningfully different from her theory of causation on her interference claim: She asks the court to infer the existence of a causal link simply from the fact that the acts occurred and sometimes took place relatively close-in-time to her opposition to Defendants' leave practices, without other direct or circumstantial evidence that Defendant acted for impermissible reasons. (*Id.* at 16–17). In the context of an FMLA retaliation claim, this Court has already concluded that such evidence does not create a genuine issue for trial on causation. *Isom*, 2015 WL 3953852, at *12.

Accordingly, Defendants are also entitled to summary judgment on Plaintiff's claim for retaliation under the FMLA.

### III. CONCLUSION

For these reasons,

IT IS ORDERED that Defendants Arizona Board of Regents, Cynthia Lietz, and Jonathan Koppell's Motion for Summary Judgment (Doc. 60) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff Dana Newell's Motion for Partial Summary Judgment on Mitigation of Damages and Motion to Disqualify Defendants' Expert under *Daubert* (Doc. 58) are DENIED.

The Clerk of the Court shall enter judgment in favor of the Arizona Board of Regents, Cynthia Lietz, and Jonathan Koppell and against Dana Newell.

Dated this 7th day of April, 2020.

James A. Teilborg
Senior United States District Judge